**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000156
27-JUN-2018
07:58 AM**

NO. CAAP-15-0000156

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee, v.
IOSEFA MEAFUA PASENE, Defendant-Appellant,
and ZORRO R. RYE, also known as Zorro Ramon Rye, Defendant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 09-1-0472)

MEMORANDUM OPINION
(By: Fujise, Presiding Judge, Leonard and Reifurth, JJ.)

Early in the morning, in front of numerous witnesses,
two men in a blue Buick sedan, drove up to Joseph Peneueta
(Peneueta), got out of the car, and shot Peneueta to death. The
passenger of the car, who shot Peneueta with a shotgun, covered
his face to conceal his identity. The driver of the car, who
shot Peneueta with a rifle, did not cover his face.

Plaintiff-Appellee State of Hawai'i (State) alleged
that Defendant-Appellant Iosefa Meafua Pasene (Pasene) was the
driver/shooter and that Zorro R. Rye (Rye) was the
passenger/shooter. After two hung juries, Pasene was found
guilty in his third trial of the second-degree murder of Peneueta
and using a firearm in the commission of a felony.[1] During the
third trial, the State presented eyewitness testimony that Pasene
was the driver who shot Peneueta and evidence that Pasene had
been in an argument with Peneueta a short time before the
shooting. The State also introduced cell phone site records that

_____

[1] After one hung jury, Rye was acquitted in the second trial and
thus was not involved in the third trial.

identified the cell phone and associated cell towers Pasene had communicated with during the time period surrounding the shooting. The State argued that these records supported its contention that Pasene was the driver of the Buick who shot Peneueta. Pasene's theory of defense was mistaken identity and reasonable doubt. Pasene suggested that the driver/shooter could have been his friend, Cedro Muna (Muna).

On appeal, Pasene contends: (1) the Circuit Court of the First Circuit (Circuit Court)[2] erred in denying his motion to dismiss the charges based on State v. Moriwake, 65 Haw. 47, 647 P.2d 705 (1982), prior to the third trial; (2) the Circuit Court erred in permitting a detective to testify that he had eliminated Muna as a suspect in the case; (3) the Circuit Court erred in admitting cell phone site records; (4) the Circuit Court erred in admitting evidence of interactions between Pasene and an undercover police officer; (5) the Circuit Court erred in denying Pasene's request to excuse a juror; (6) the prosecutor engaged in misconduct which deprived Pasene of a fair trial; and (7) the Circuit Court erred in denying Pasene's motions for mistrial and for a new trial based on prosecutorial misconduct. We affirm.

BACKGROUND

I.

The following matters were undisputed. Sometime after 2:00 a.m. on March 28, 2009, Pasene and Peneueta got into an argument at a liquor store on Maunakea Street in Chinatown. At around 4:00 a.m., Peneueta was with a group of friends and associates a block away from the liquor store on Pauahi Street. A blue Buick four-door sedan drove up and abruptly stopped in front of Peneueta. Two men got out of the Buick. The driver, whose face was uncovered, was carrying a rifle. The passenger, whose face was covered, was carrying a shotgun. The two men approached Peneueta fired shots at Peneueta and continued to shoot at Peneueta as he attempted to flee. Peneueta eventually fell and remained on the ground in the middle of the road near

---

[2]     The Honorable Rom A. Trader presided over the proceedings at issue in this appeal.

2

the intersection of Pauahi and River Streets. He had been shot several times with bullets from a rifle and birdshot pellets from a shotgun.

Peneueta was not breathing and had no pulse when the paramedics arrived, and he was pronounced dead at Queen's Medical Center a short time later. The cause of Peneueta's death was loss of blood due to injuries inflicted by bullet wounds and shotgun pellets. Later in the morning of the shooting, at about 6:00 a.m., a blue Buick, matching the description of the vehicle used in the shooting, was found burning in the Wahiawa area.

Pasene, Rye, Muna, and Antonias Paul Toloai (Toloai) all grew up in the same neighborhood in San Francisco. Rye and Toloai are Pasene's cousins. Pasene and Toloai were Muna's friends.

Peneueta, Gabriel Sakaria (Sakaria), and Richard Tagataese (Tagtaese) were from Kuhio Park Terrace (KPT). They grew up together, were in school together, were all friends, and resided at KPT.

II.

The State presented the following evidence at the third trial.

A.

In late February 2009, a joint federal/state law enforcement task force was formed "to address ongoing hostility and activity that was occurring between groups" in Chinatown. There are twenty five surveillance cameras located in the Chinatown area that the police can control and monitor from the Downtown substation. In the beginning of March 2009, the task force introduced an undercover officer into the Chinatown area to interact with a particular group. The task force used video and audio surveillance in their undercover operations.

On March 10, 2009, the undercover officer was approached by Pasene. Between March 10 and March 26, 2009, the undercover officer met with Pasene six times. Pasene provided the undercover officer with a cell phone number, 699-1829, which the undercover officer used to set up his meetings with Pasene.

In every occasion in which the undercover officer used this phone number to contact Pasene, only Pasene answered the phone. During his meetings with Pasene, the undercover officer saw Pasene driving a blue Buick sedan, license number JGA 055. Two of the undercover officers' meetings with Pasene were held inside this car while it was parked. A surveillance officer for the task force testified that between late February and March 26, 2009, he personally observed Pasene operating the blue Buick about ten times. The surveillance officer never saw anyone else operating the blue Buick during this time period.

Muna testified that he had purchased the Buick sometime in January of 2009, owned it for about four weeks, then sold it to Tia (also known as Natalie) at the end of January. Muna was present when Tia sold the Buick to Pasene in the middle of February 2009. Motor vehicle records reflect a certificate of title for the Buick identifying Muna as the seller, with a February 10, 2009, date of transfer, and Sylvia Hall (Hall) as the new registered owner. Hall did not have a driver's license. When the police interviewed Hall during the murder investigation, she was accompanied by a social worker, and Hall was described as a "simple person" and a "simple type personality person."

B.

On the evening before the shooting, Peneueta was out with his girlfriend, Mary Savusa (Savusa), and Savusa's cousin, Tutuila Peleafi (Peleafi). After leaving a strip bar on Keeamoku Street at around 1:30 or 2:00 a.m., the three drove to a nearby McDonald's to get something to eat. When they finished eating, Peneueta started driving toward KPT, where they all lived, but then decided to go to a liquor store on Maunakea Street in Chinatown. Peneueta parked across the street from the liquor store and went to the store, while Paleafi and Savausa remained in the car. Peneueta greeted a couple a friends who were outside the liquor store. Peneueta then approached a "tall guy" and began arguing with him on the sidewalk.

At trial, Paleafi identified the "tall guy" arguing with Peneueta as Pasene. Paleafi stated that she later saw the person who had been arguing with Peneueta "on the news" and

4

identified photographs of Pasene introduced at trial as this person. Savusa also testified that she saw the person arguing with Peneueta on the news a day or two after the shooting, and her reaction was that "they got him."

During their argument, Peneueta was "up in" Pasene's face and Pasene "looked tense." The windows in the car were up, and therefore Peleafi could not hear what Peneueta and Pasene were saying. After Pasene argued with Peneueta for several minutes, Pasene crossed the street and passed right by the two women in the car. Both Peleafi and Savusa testified that Pasene told Peneueta to "stay" or "wait" there; "I'll be right back."

Savusa told Peneueta to get back in the car, and he complied. Peneueta drove Paleafi home to KPT and dropped her off. While there, Peneueta picked up a friend, whose nickname was "Giant," then Peneueta, Savusa, and Giant went back to Chinatown. Savusa testified that Peneueta and Giant did not have any weapons. Peneueta and Giant got out of the car in Chinatown, leaving Savusa behind. Savusa fell asleep in the car. When she woke up, the sun had risen, but Peneueta and Giant had not returned to the car. Savusa drove around Chinatown looking for them, saw police and yellow crime-scene tape all over, and decided to return home. When she returned to KPT, people told her what had happened.

C.

In the afternoon of March 27, 2009, prior to the shooting, Pasene, Muna, and Toloai were arrested and taken to the main police station. With the assistance of bail bond agent Linda Del Rio (Del Rio), Muna posted bail and was released at about 1:00 a.m. the next morning. Del Rio took Muna to get something to eat, and they returned to the police station for Pasene and Toloai, who were released at about 1:30 a.m.

According to Muna, Rye also appeared at the police station, and Rye drove Pasene, Muna, and Toloai to Chinatown in Rye's car, a gold Nissan Maxima. Rye dropped Muna and Toloai off on the corner of River and Beretania Streets. Muna and Toloai stayed there for about 30 minutes, then they walked to the liquor store on Maunakea Street.

There were about fifteen people gathered in front of the liquor store, including Pasene and Rye. Muna saw Pasene and Peneueta arguing. At that time, Muna did not know Peneueta, but knew "of him." The argument between Pasene and Peneueta lasted about two minutes and was "[a] little serious." No one else got involved in the argument. When the argument stopped, Pasene walked away from the liquor store with Rye, Muna, and Toloai.

Sakaria, Peneueta's friend from KPT, was among the people who were gathered in front of the liquor store. According to Sakaria, before Peneueta arrived, there was a fight at the store between "Ropati" and another guy, which several people intervened to stop. Peneueta arrived just after the fight ended and shook hands with Sakaria and a few others there. A short time later, Sakaria heard a commotion and observed Pasene and Peneueta aggressively arguing and swearing at each other. The argument lasted for "a couple minutes" and no one else participated. When the argument ended, Sakaria saw Pasene walking away with Muna and two other guys. Sakaria testified that he heard Pasene tell Peneueta, "Where we from we don't fight, we shoot, shoot to kill." Pasene was walking backwards and facing Peneueta when he made this statement.

Muna testified that after leaving the liquor store, he, Pasene, Rye, and Toloai walked to the corner of River and Beretania Streets. Muna and Toloai stayed there and Pasene and Rye left. About 30 minutes later, Muna saw Pasene in a parking lot on the other side of Beretania Street. Muna and Toloai walked over to the parking lot. Muna saw Daniel Ropati (Ropati), who was from KPT, approaching the parking lot, and Muna told Ropati to turn around. Pasene pulled out a shotgun, pointed it towards Ropati, and told Ropati to "get away" or Pasene would shoot him. Pasene "was mad." Muna jumped in front of the shotgun because he did not want Pasene to shoot Ropati, and Pasene put the gun down. Ropati turned around and walked back across the street.

Muna and Toloai also walked across Beretania Street to the corner of Beretania and River Streets to catch a taxi to go back to their hotels. After crossing Beretania Street, Muna saw

Ropati, who also wanted to catch a taxi. Ropati's taxi apparently arrived first, and it stopped on River Street facing towards Beretania Street. Ropati agreed to allow Muna and Toloai to take his taxi. Muna got into the back seat on the driver's side and Toloai got in on the other side. Just after Muna got into the taxi and while the taxi was still not moving because of a red light, Muna saw a blue Buick make a right turn from Beretania Street onto River Street, heading toward Pauahi Street. Muna recognized the Buick as his former car. Muna also saw that Pasene was driving the Buick.

When the light facing the taxi turned green and as the taxi was proceeding on Beretania Street, Muna heard about ten gunshots. The taxi driver remarked that it sounded like firecrackers and kept driving away. The taxi dropped Muna off at the Plaza Hotel near the airport. At trial, the State introduced video surveillance recordings from the Plaza Hotel showing its lobby and front desk area. Muna identified himself as one of the people shown in the surveillance video. Muna testified that after arriving at the Plaza Hotel, he realized that he had already checked out of that hotel and was staying at the Miramar Hotel in Waikiki.[3] He therefore caught another taxi to the Miramar Hotel in Waikiki.

Darren Kawelolani (Kawelolani) testified that on March 28, 2009, at about 4:00 a.m., he was working as a taxi driver when he received a call from Ropati, who was a regular customer. Ropati asked to be picked up at the corner of River and Beretania Streets. When Kawelolani arrived, Ropati said he was not ready to leave, and two other passengers got into the backseat of Kawelolani's taxi. Kawelolani was asked to drive to the Plaza Hotel. Kawelolani's taxi was on River Street, near to and facing in the direction of Beretania Street, when he picked up the two passengers. While stopped on River Street, Kawelolani saw a blue car turn from Beretania Street onto River Street, coming toward him from the opposite direction. As the blue car turned onto River Street, it passed within about three feet of

_____

[3]     Muna stated on cross-examination that he had been staying at the Miramar Hotel for a week when he mistakenly went to the Plaza Hotel.

Kawelolani's taxi. Kawelolani was able to see the driver of the blue car, who Kawelolani described as having long hair and a beard. Kawelolani later saw the driver "on the news on the television" and thought "that's the person that was on River Street that -- that passed me."

From River Street, Kawelolani turned left onto Beretania Street. As he turned left, Kawelolani heard what sounded like fire crackers or gunshots, eight to ten very loud pops. One of the passengers said, "[i]t's gunshots, we should go." Kawelolani drove to the Plaza Hotel and dropped off one of the passengers. He drove the other passenger back to Chinatown. In an interview with the police and at trial, Kawelolani identified a photograph of Toloai as the passenger he had taken back to Chinatown. Kawelolani was not able to identify the passenger he dropped off at the Plaza Hotel.

D.

Sakaria testified that after witnessing the argument between Pasene and Peneueta at the liquor store and seeing both of the them leave, he walked to the Pauahi Recreation Center, which is near the intersection of Pauahi and River Streets, about a block away from the liquor store. Sakaria sat on a plastic bucket near the entrance of the Recreation Center and was soon joined by his friends, Tagataese and Samson Filipo (Filipo) from KPT. A short time later, Peneueta and Giant arrived, walking from the direction of Maunakea Street. Other people were also gathered in front of the Recreation Center, and everyone was "kicking back" and talking.

Sakaria testified that a blue four-door Buick came speeding up Pauahi Street from the direction of River Street and stopped in front of them. Two men jumped out of the Buick: Pasene, who was driving the Buick and whose face was not covered, and the passenger, whose face was covered. Pasene was carrying a rifle and pointed the rifle at Peneueta, who was standing next to Sakaria. The passenger pointed a shotgun at Peneueta and approached until he was right next to Peneueta. As Pasene walked toward Peneueta, Pasene said to Peneueta, "Oh, what's up now?"

Sakaria then "heard [] the gun go off, shot fired." Sakaria was a couple feet away from Pasene when the gun went off. Sakaria saw Peneueta try to grab the gun and pull it away. Sakaria ran towards Maunakea Street. As he was running away, he heard over ten shots fired.[4]

Sakaria identified Pasene in court as the driver of the Buick and as the same person he had seen arguing with Peneueta at the liquor store. Sakaria testified that while he was next to Peneueta, Pasene approached Peneueta holding the rifle until Pasene was three feet away. Sakaria testified that the lighting was bright and that from a distance of three feet, he had a clear and unobstructed view of Pasene's face while Pasene was pointing the rifle at Peneueta. Sakaria stated that he was a "[h]undred percent" sure that the person standing three feet away from him with the rifle was Pasene. Sakaria also stated that he knew

---

[4]     With respect to the sequence of events after the Buick pulled up, Sakaria testified on cross-examination as follows:

> Q.  You're there, a car pulls up, two men get out, and you see that they have guns, yes?
>
> A.  Yes.
>
> Q.  You see that they have guns, you see them moving towards [Peneueta], and you start running up Pauahi towards Maunakea, yes?
>
> A.  Yes.
>
> . . . .
>
> Q.  And it's after you start running when you first hear the shots, yes?
>
> A.  Yes.
>
> Q.  Okay.  Men get there, they jump out, see the guns, start running, you hear the shots; right?
>
> A.  Yes.
>
> Q.  You started running away before the shots were fired; right?
>
> A.  The same time I was running the shot was going off.
>
> Q.  Okay.  And because you were heading in the opposite direction, running the opposite direction, you didn't see the shots being fired; correct?
>
> A.  Yes.

Cedro Muna and that he was positive that the driver holding the rifle was not Muna.

Tagataese also identified Pasene as the driver of the car. Tagataese testified that he and Filipo stopped in front of the Pauahi Recreation Center and were "talking story" with Sakaria. They were soon joined by Peneueta and Giant. There were twelve to fifteen people gathered in the area.

Tagataese heard a car speeding which came to a screeching halt in front of them. Two men jumped out of the car holding guns. The passenger's face was covered with a handkerchief, but the driver's face was not covered. The two men taunted Peneueta, saying "What's up now?" as they pointed their guns at Peneueta and walked towards him.

The driver was carrying a rifle and the passenger was carrying a shotgun. Peneueta took a swing at the passenger, who was holding the shotgun, and tried to get away by running towards River Street. Tagataese headed in the opposite direction, but turned so that he could see where the two gunmen were. Tagataese saw the two gunmen chasing Peneueta, taunting him and firing shots at him. Peneueta stumbled and fell to the ground near the intersection of Pauahi and River Streets. Tagataese saw the driver walk up to Peneueta, stand over his body, and "let off a couple more shots."

Tagataese identified Pasene in court as the driver. Tagataese testified that the lighting was good, and as the driver got out of the car and was walking towards Peneueta, Tagataese had a clear and unobstructed view of the driver from a distance of twenty feet. Tagataese testified that he was a "[h]undred percent" positive of his identification of Pasene as the driver. Tagataese also stated that he knows Cedro Muna and was sure that Muna was not the person who got out of the car and shot Peneueta.

E.

Paramedics responded to the scene at 4:21 a.m. Peneueta was not breathing and had no pulse. The paramedics transported Peneueta to Queen's Medical Center. Attempts to revive Peneueta and restart his heart were unsuccessful, and he

was pronounced dead. An autopsy of Peneueta's body was performed by forensic pathologist Kanthi De Alwis, M.D. (Dr. De Alwis). Dr. De Alwis found that Peneueta had sustained three separate gunshot wounds as well as injuries caused by birdshot pellets fired by a shotgun. Peneueta suffered multiple internal injuries to his vital organs, including his heart, both lungs, liver, aorta, and kidney, his spinal cord was severed, and his ribs were fractured. Dr. De Alwis opined that the cause of death was heavy bleeding due to injuries to Peneueta's vital organs caused by the gunshot and shotgun injuries and that the gunshot and shotgun injuries were all fatal wounds. Evidence recovered at the scene of the shooting included fourteen discharged cartridge casings that were fired from the same firearm and three discharged shot shells fired from the same firearm. A bullet hole was also found in the glass entrance door to the Pauahi Recreation Center.

F.

Sakaria, Tagataese, and Filipo took cover and hid in an alley while the gunmen were shooting at Peneueta. After the gunmen drove away, Sakaria, Tagataese, and Filipo went back to check on Peneueta, and they went to Queen's Medical Center after the ambulance took Peneueta there. At the hospital, a police officer asked Sakaria if he could identify the shooter, and Sakaria said he could. Sakaria, Tagataese, and Filipo went from the hospital to the police station to be interviewed.

Honolulu Police Department (HPD) Detective Gregory McCormick (Detective McCormick) was the lead homicide detective for the shooting of Peneueta. Detective McCormick was at home when he was notified of the shooting shortly after 5:00 a.m. on March 28, 2009. Detective McCormick went to Queen's Medical Center, where he was briefed by other detectives. Detective McCormick was given the names of Pasene, Muna, and Toloai as possible suspects and was told there were eyewitnesses to the shooting. Detective McCormick went to the police station to interview the eyewitnesses. He arrived at the police station at about 6:05 a.m. and printed out pictures of individuals named as possible suspects.

Detective McCormick first interviewed Tagataese at 6:49 a.m. Before Tagataese entered the interview room, Detective McCormick asked Tagataese if he had actually witnessed the shooting, and Tagataese said he had. Detective McCormick asked Tagataese if he knew one or both of the people responsible for the shooting, and Tagataese said he knew one of the shooters and provided a name of "Sef" or "Sefa" (Pasene's first name is "Iosefa"). Tagataese said this person was someone he was familiar with in the Chinatown area. During the interview, Detective McCormick showed Tagataese a photograph of Pasene and asked him who that was. Tagataese responded that the person in the photograph was "Sef" or "Sefa," who was the driver of the vehicle and one of the shooters. Tagataese also stated that he learned that this person went by the name "Sef" earlier that day.

Detective McCormick next interviewed Sakaria and asked him if he actually witnessed the shooting and if he knew one or both of the shooters. Sakaria said he had actually witnessed the shooting and knew the driver of the vehicle as "Sef" or "Sefa." Detective McCormick also interviewed Filipo who did not recognize either of the individuals involved in the shooting. Detective McCormick used a single photograph in his interviews with Tagataese and Sakaria and a six photograph lineup in his interview with Filipo.

After Detective McCormick completed his interviews of the three eyewitnesses, Muna showed up at the police station. Detective McCormick interviewed Muna, and Muna was not arrested in the case. As part of his investigation of Muna, Detective McCormick reviewed some of the camera videotape from Chinatown. Detective McCormick's review of that video as well as other aspects of his investigation led him to eliminate Muna as a suspect in the shooting. Detective McCormick interviewed Kawelolani, the taxi driver, and showed him a picture of Toloai.

Detective Theodore Coons (Detective Coons) was Detective McCormick's partner in the homicide investigation. As part of the investigation, Detective Coons reviewed video from surveillance cameras in the Chinatown area, including video from a camera at the intersection of Pauahi and River Streets.

12

Detective Coons testified that his review of the Chinatown video was one of the aspects that led the police to rule out Muna as a suspect, and Muna was never arrested in this case. In investigating Muna, the police had received information that Muna had been taken from the Downtown area to the Plaza Hotel by the airport. Detective Coons went to the Plaza Hotel, met with the hotel's security officer, reviewed "surveillance footage," and made a copy of the footage to be used as evidence. The State introduced a copy of the Plaza Hotel surveillance footage as evidence at the trial.

G.

On March 28, 2009, at 5:57 a.m., the police were notified that a blue Buick sedan, license number JGA 055, was reported burning in the Wahiawa area. Task force officers had seen Pasene driving this car in the weeks preceding the shooting, and the car was identified as the car used in the shooting.

Pasene had provided the task force undercover officer with a cell phone number, 699-1829, which the undercover officer had used to contact Pasene and which Pasene had used to call the undercover officer, to set up meetings before the shooting. At trial, the State introduced records pertaining to this cell phone number, which were obtained from Mobi PCS (Mobi), through Vincent Monaco (Monaco), a networking engineering manager and a custodian of record for Mobi. The Mobi cell phone account for 669-1829 was active from March 2, 2009, to March 30, 2009. The State introduced subscriber information for this account,[5] as well as records showing which cell phone towers communicated with the cell phone for 669-1829 and the text messages sent from this phone number during the period surrounding the shooting.

At trial, Monaco was qualified as an expert "in cell phone technology and the technique of locating and plotting origins of cell phone calls using cell phone records." Monaco testified that as part of its network, Mobi has about a hundred cell sites or towers on Oahu that are used to complete phone

---

[5]     Mobi's records list Fasi Lya (Fasi) as the subscriber for the cell phone with the 669-1829 number. However, Monaco testified that Mobi is a "prepay provider" and does not verify the accuracy of information provided by a customer in obtaining a phone.

calls and text messages from its cell phones. Monaco explained how Mobi's cellular telephones communicate with its cell towers; that Mobi records information and maintains records pertaining to the cellular phone services it provides, including the cell towers accessed by a specific phone number; and how he prepared the records pertaining to phone number 669-1829 that were introduced at trial.

The cell record exhibits for 669-1829 introduced at trial show, among other things, that on March 28, 2009, the day of the shooting, the cell phone associated with 669-1829 communicated with a cell tower in the vicinity of the main police station at 1:33 a.m. and a cell tower in the vicinity of Wahiawa between 5:52-5:53 a.m., which is near the time the Buick was reported burning in the Wahiawa area. A text message sent from 669-1829 at 7:47 a.m. on March 29, 2009, stated: "I need a lawyer because they trying 2 put a hot one on me so dont talk on da phone."

After Peneueta was shot, the police looked for Pasene in Chinatown, where he previously had frequently been seen, but were unable to find him. The police had the undercover officer use the number Pasene had given him (669-1829), and which they had used in their prior dealings, to arrange a meeting with Pasene. The undercover officer used this number to set up a meeting with Pasene on March 30, 2009, in the parking lot near Anna Miller's in Pearlridge, to conduct a transaction involving $6,000. Pasene appeared at the scheduled date and time for the arranged transaction, and he was subsequently arrested by the police.

III.

After the State rested its case in chief, Pasene presented the following evidence.

A.

Del Rio, the bail bond agent who assisted in posting the bail for Pasene, Muna, and Toloai on March 28, 2009,

14

testified that at some point after the shooting, Muna told her, "Aunty, I shot someone."[6]

Pasene presented the testimony of Luatua Tuua (Tuua) through Tuua's prior video deposition because Tuua could not be located and thus was unavailable for trial. Tuua is Pasene's cousin. Tuua testified that on March 28, 2009, after Pasene was released from police custody, Tuua met Pasene in Chinatown before 4:00 a.m. to give him a ride. Tuaa took Pasene to Pasene's girlfriend's house and dropped him off there. Tuaa asked Pasene if he could use Pasene's cell phone, and Pasene left a phone with Tuua.

On cross-examination, Tuua said he started work that day at 7:30 or 8:30 a.m. After dropping Pasene off, Tuua kept possession of the phone until he gave the phone to Fasi right before Tuaa started work. According to Tuua, when he asked to borrow the phone from Pasene, he thought the phone belonged to Pasene. But Pasene told him it was Fasi's phone, so Tuua wanted to give the phone back to Fasi. Tuua did not know Fasi very well. Tuua said that Fasi called looking for the phone, and Tuua met Fasi and gave Fasi the phone. Tuua could not remember how long he had the phone before Fasi called or where in town he met Fasi. Tuua testified that he did not recall making any calls from the phone, did not answer the phone (except the call from Fasi), and did not remember whether he used the phone for text messages. Tuua did not remember the phone number of the phone he borrowed from Pasene and did not know if Pasene had more than one phone.

B.

Pasene testified in his own defense at trial. Pasene testified that he grew up in San Francisco and goes by the name "Sef." He came to Hawai'i in late February 2009 and had never

---

[6]    Muna testified that after his March 27, 2009, arrest for which Del Rio had posted his bail, he made his first court appearance in that case and was permitted to return to California. However, he did not return for subsequent court appearances, his bail was revoked, and he was "on the run" until he was arrested in February 2013 and extradited back to Hawai'i. Muna stated his relationship with Del Rio was bad because he jumped bail and the bail bonds person had to come up with the money because of his failure to appear for court.

lived in Hawai'i before then.  Toloai is Pasene's cousin.  Muna was Pasene's friend and they grew up together in San Francisco.  Muna was good friends with Ropati, who was from KPT.  Pasene stated that when he and Muna were arrested on March 28, 2009, they were the same weight, the same height, and both had long hair.  Pasene identified photos taken at the time of their arrest, which showed that they were both wearing a white t-shirt and black pants.

According to Pasene, when he, Muna, and Toloai were released from police custody on the morning of March 28, 2009, they were picked up by Rye.  Rye dropped them off at the liquor store on Maunakea Street.  While Pasene was at the liquor store, Ropati and another guy from KPT got into a fight with Aleka from Mayor Wright housing.  Pasene broke up the fight, which angered Ropati, who began arguing with Pasene, because Ropati did not want Pasene to break up the fight.  Peneueta then approached Pasene and told Pasene to stay out of their business and to mind his own business.  Peneueta appeared to be drunk.  Pasene did not know Peneueta and had never seen him before that night.  Pasene denied telling Peneueta that "where I'm from, I shoot, and I shoot to kill."

Pasene left the liquor store to find Fasi's car, which he had been using on March 27, 2009, prior to his arrest.  When he could not find Fasi's car,[7] Pasene called his cousin Tuua to pick him up.  Pasene went back to the liquor store where he saw Muna and Toloai.  They walked to River Street, where Pasene was picked up by Tuua, while Muna and Toloai remained there.  Pasene testified that Tuua dropped him off at his girlfriend's house, which was located at the intersection of Lusitana and Punchbowl Streets.  Pasene said that after he was dropped off, he stayed at his girlfriend's house until noon on March 29, 2009, at which time his girlfriend dropped him off at his cousin Will's house in Pearlridge.

With respect to the 669-1829 cell phone, Pasene stated that this phone belonged to Fasi.  Pasene acknowledged that he

---

[7]     Pasene stated that he later learned that Fasi had picked up the car.

frequently used this phone. Pasene stated that he used the phone when he was with Fasi because Pasene had many of his personal numbers stored in this phone and because Fasi also had another phone. Pasene testified that when Tuua dropped him off at his girlfriend's house in on March 29, 2009, Pasene gave the 669-1829 cell phone and Fasi's car keys to Tuua to have Tuua return them to Fasi. However, when his girlfriend dropped Pasene off at his cousin Will's house in Pearlridge on March 29, 2009, Pasene got the 669-1829 cell phone back because Fasi was also living there, and Pasene used the phone to call his bail bond agent. Pasene did not know what Tuua had done with the phone while Tuua was in possession of the phone.

With respect to the blue Buick with license number JGA 055 that was involved in the shooting, Pasene acknowledged that he had occasionally used this car. Pasene, however, stated that the car belonged to Muna and that others including Muna, Ropati, and Toloai, also drove the car. Pasene said that he would only borrow the car for a few hours, then return it to Muna. He did not know Hall, the registered owner of the car.

Pasene denied shooting Peneueta or being there when he was shot. Pasene stated that he had never seen Tagataese or Sakaria before they appeared to testify in this case. Pasene also denied that he had used this phone on March 29, 2009, to send the text "I need a lawyer because they trying 2 put a hot one on me so dont talk on da phone."

IV.

The jury found Pasene guilty as charged of the second-degree murder of Peneueta and using a firearm in the commission of a felony. The Circuit Court sentenced Pasene to life imprisonment with the possibility of parole on the second-degree murder conviction and twenty years of imprisonment on the conviction for using a firearm in the commission of a felony. The Circuit Court imposed these terms of imprisonment to run concurrently with each other and with any other term being served. The Circuit Court filed its Amended Judgment on March 9, 2015, and this appeal followed.

17

DISCUSSION

I.

Pasene contends that the Circuit Court erred in denying his motion to dismiss based on Moriwake after two prior trials had ended in hung juries. In Moriwake, the Hawai'i Supreme Court held that trial courts, "[w]ithin the bounds of duly exercised discretion," have the inherent power in appropriate circumstances to dismiss an indictment with prejudice following one or more mistrials resulting from genuinely deadlocked juries, even though the dismissal is not constitutionally required. Moriwake, 65 Haw. at 55, 647 P.2d at 712. In reviewing a trial court's exercise of discretion in ruling on a motion to dismiss based on Moriwake, we will accord deference to the trial court's conclusion. State v. Deedy, 141 Hawai'i 208, 224, 407 P.3d 164, 180 (2017) ("We will not vacate a trial court's Moriwake ruling unless the party challenging the ruling can make a strong showing that the court abused its discretion by clearly exceeding the bounds of reason or disregarding rules or principles of law or practice."). In this case, Pasene fails to make the requisite "strong showing" and we conclude that the Circuit Court did not abuse its discretion in denying Pasene's motion to dismiss.

A.

Pasene's first two trials ended in hung juries.[8] Prior to his third trial, Pasene filed a motion to dismiss the remaining charges[9] against him with prejudice based on Moriwake.

---

[8]    The Honorable Richard W. Pollack presided over Pasene's first trial. The Honorable Rom A. Trader presided over Pasene's second trial and subsequent proceedings.

[9]    Pasene and Rye were charged in the indictment with the following offenses: (1) second-murder of Peneueta (Pasene and Rye -- Count 1); (2) place to keep loaded firearm (Pasene -- Count 2); (3) use of a firearm in commission of a felony (Pasene -- Count 3); (4) first-degree terroristic threatening of Ropati with the use of a dangerous instrument (Pasene -- Count 4); (5) place to keep loaded firearm (Rye -- Count 5); and (6) use of a firearm in commission of a felony (Rye -- Count 6). Prior to the first trial of Pasene and Rye, the Circuit Court granted with prejudice the State's motion to nolle prosequi Counts 2 and 5. The first trial of Pasene and Rye ended in a hung jury on the counts presented (Counts 1, 3, 4, 6). In the second trial of Pasene and Rye, the jury found Pasene not guilty of Count 4, could not reach a unanimous verdict as to Pasene on Counts 1 and 3, and found Rye not guilty as to Counts 1-6. Thus, prior to the third trial, the counts remaining were the charges against Pasene for second-degree murder (Count 1) and for use of a firearm in the commission of a felony (Count 3).

The State opposed the motion. The record indicates that the jury split 9 to 3 in favor of guilty in the first trial on these charges, and 9 to 3 in favor of not guilty in the second trial. After holding a hearing on Pasene's motion, the Circuit Court denied the motion.

In <u>Moriwake</u>, the supreme court concluded that in deciding whether to dismiss an indictment after one or more hung juries, the trial court should balance "the interest of the state against fundamental fairness to a defendant with the added ingredient of the orderly functioning of the court system." <u>Moriwake</u>, 65 Haw. at 55, 647 P.2d at 712. The trial court should consider several factors in undertaking this balance, including:

> (1) the severity of the offense charged; (2) the number of prior mistrials and the circumstances of the jury deliberation therein, so far as is known; (3) the character of prior trials in terms of length, complexity and similarity of evidence presented; (4) the likelihood of any substantial difference in a subsequent trial, if allowed; (5) the trial court's own evaluation of relative case strength; and (6) the professional conduct and diligence of respective counsel, particularly that of the prosecuting attorney.

<u>Id.</u> at 56–57, 647 P.2d at 712–13.

B.

In denying Pasene's motion to dismiss, the Circuit Court considered each of the <u>Moriwake</u> factors. Among other things, the Circuit Court found that the severity of the murder offense charged clearly cut against dismissal; that the acquittal of Rye, which allowed the State to focus its evidence on Pasene, changed "the dynamic" of the case, such that the Circuit Court could not say that the outcome of a third trial would be the same and thus cut against dismissal; and that in terms of its evaluation of the relative case strength, there was ample evidence for a jury to reach a unanimous decision, which cut against dismissal.[10] According appropriate deference to the

---

[10] The Circuit Court found that the character of prior trials favored dismissal; that the conduct of respective counsel was neutral; and that the number of prior mistrials and the circumstances of jury deliberations did not cut in favor of dismissal. With respect to this second factor, the State represented that it had received information that in the first trial, the jury had reached a unanimous verdict finding Pasene guilty of second-degree murder, but that during a delay caused by the need to address a report of alleged

(continued...)

Circuit Court's consideration and application of the <u>Moriwake</u> factors, we conclude that Pasene failed to demonstrate that the Circuit Court abused its discretion in denying his motion to dismiss. <u>See</u> <u>Deedy</u>, 141 Hawai'i at 224-32, 407 P.3d at 180-88.

II.

Pasene argues that the Circuit Court erred in permitting Detective McCormick to testify that he had eliminated Muna as a suspect in the case. Pasene asserts that this testimony was tantamount to an opinion that Muna was innocent, which Pasene claims was prejudicial to him because his "defense in large part was that Mr. Muna was the shooter, and that [Pasene] was misidentified due to his resemblance to Mr. Muna." Pasene contends that the Circuit Court should have precluded Detective McCormick's testimony under Hawai'i Rules of Evidence (HRE) Rule 403.[11] He also contends that because Detective McCormick did not witness the shooting, his testimony was not rationally based on his perception as required by HRE Rule 701.[12] We conclude that Pasene's arguments are without merit.

A.

Detective McCormick was the lead detective in the homicide investigation. At Queen's Medical Center, immediately after the fatal shooting of Peneueta, Detective McCormick was provided with the names of Pasene, Muna, and Toloai as possible suspects. On the day of the shooting, Muna came to the police station and was interviewed. After interviewing Muna, Detective

---

[10](...continued)
improper contact with a juror, the jury re-voted and was split 9 to 3 in favor of guilty.

[11]     HRE Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[12]     HRE Rule 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness, and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

McCormick took steps to corroborate the information Muna provided, including reviewing recordings from surveillance cameras in Chinatown and surveillance cameras in the Plaza Hotel that were taken on the date of the shooting.[13]

Detective McCormick was permitted to testify at trial that Muna was interviewed and that he was not arrested in the case. Detective McCormick was also permitted to testify that he was able to eliminate Muna as a suspect based in part on his review of Chinatown surveillance videos:

> [Prosecutor:] Q. Okay. So just to recap, you were given three names at the Queen's Hospital?
>
> [Detective McCormick:] A. Yes.
>
> Q. One of 'em is Cedro Muna?
>
> A. Yes.
>
> Q. And I asked you if Cedro Muna had ever been arrested and you said no?
>
> A. Correct.
>
> Q. Then I asked you what steps you took. And so now I'm going to begin with my question.
>
> A. Okay.
>
> Q. As part of your investigation of Cedro Muna, you reviewed some of the camera videotape from Chinatown; is that correct?
>
> A. Yes.
>
> Q. Okay. And based upon your review of that -- of that video, that was part of the reason why you were able to eliminate Mr. Muna as a suspect?
>
> A. That was part of the reason, yes.

---

[13] The record indicates that Muna denied any involvement in the shooting and told Detective McCormick that he heard gunshots just after he and Toloai got into a taxi in Chinatown that dropped him off at the Plaza Hotel. Detective McCormick purportedly reviewed video recordings from the Chinatown surveillance cameras for the early morning of March 28, 2009, which depicted two people, one resembling Muna, getting into a taxi on River Street as another vehicle, similar to the suspect Buick, passed the taxi coming from the opposite direction. Due to technical difficulties, the video recordings purportedly reviewed by Detective McCormick were not preserved because they were inadvertently overwritten. As a result, the Circuit Court did not permit Detective McCormick to describe in detail the contents of the video recordings. Detective Coons obtained video surveillance footage from the Plaza Hotel, which the police described as showing a male resembling Muna enter the hotel lobby on March 28, 2009 at about 4:27 a.m. and then leave twelve minutes later. The State introduced a copy of the surveillance footage from the Plaza Hotel, but the State's copy did not include a date or time stamp. Detective McCormick also interviewed taxi driver Kawelolani.

Q.  Okay.  And in addition to other parts of your investigation which -- in addition to the video that you saw led you to eliminate Mr. Muna as a suspect in the shooting?

A.  Yes.[14]

B.

In asserting that the charges against him were based on a misidentification, Pasene explicitly and implicitly challenged the validity, competence, and thoroughness of the police investigation.  Detective McCormick's testimony was relevant to explain the actions of the police in conducting their investigation and to address the implication that the police investigation was deficient for failing to adequately investigate whether Muna was one of the shooters.  We conclude that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.  See HRE Rule 403.  We also reject Pasene's argument that because Detective McCormick did not witness the shooting, his testimony was inadmissible as not rationally based on his perception.  Detective McCormick had personal knowledge of the actions taken by Detective Coons and himself to eliminate Muna as a suspect.  Accordingly, we conclude that the Circuit Court did not err in admitting Detective McCormick's testimony.

III.

Pasene contends that the Circuit Court erred in admitting cell phone site records for the cell phone associated with the number 699-1829.  The admitted records identified the location of the particular Mobi cell tower that the Mobi cell phone with the number 699-1829 was communicating with at various times during the period surrounding the shooting on March 28, 2009.

The process by which a cell phone communicates with cell towers, which generates the information contained in cell phone site records, has been explained as follows:

---

[14]  Detective Coons was also permitted to testify that his review of video from Chinatown surveillance cameras was one of the aspects that led police to rule out Muna as a suspect.  Pasene does not specifically challenge Detective Coons' testimony on appeal.  Detective Coons also testified that he obtained surveillance footage from the Plaza Hotel, which was introduced at trial.

> A cell phone transmits and receives signals throughout a cellular network like a two-way radio. Cell phone networks are divided into geographic coverage areas that are called cell sites or towers. Each cell site contains an antenna that receives and transmits signals to cell phones. . . . The size of the area served by a cell site will depend upon a number of factors, including but not limited to, the height of the antennas, topography of the land, vegetative cover and physical obstructions. When a call is placed on a cell phone, the phone will connect to the cell site with the strongest signal. As a cell phone user moves from place to place, the cell phone automatically switches to the tower that provides the best reception.
>
> . . . .
>
> [C]ell phone service providers create and maintain records of cell phone interaction with cell phone towers. It has been observed that a cell service provider collects and stores historical cell site data for its own business purposes, perhaps to monitor or optimize service on its network or to accurately bill its customers for the segments of its network that they use. That same information makes it possible to identify at least the general location of a cell phone at the time the phone connects to a tower.

State v. Johnson, 797 S.E.2d 557, 562-563 (W. Va. 2017) (citations, parentheticals, and quotation marks omitted).

Pasene argues that the Circuit Court erred in admitting Mobi's cell phone site records for number 699-1829 under HRE Rule 803(b)(6) (2016)[15] because he claims the records were created solely in anticipation of litigation or prosecution. He further contends that the State failed to show that the information set forth in the records was based on a reliable foundation. We conclude that Pasene's arguments are without merit.

---

[15] HRE Rule 803(b)(6) provides in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> . . . .
>
> (b)  Other exceptions.
>
> . . . .
>
> (6)  Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made in the course of a regularly conducted activity, at or near the time of the acts, events, conditions, opinions, or diagnoses, as shown by the testimony of the custodian or other qualified witness, . . . unless the sources of information or other circumstances indicate lack of trustworthiness.

A.

1.

Prior to his first trial, Pasene moved in limine to preclude admission of the cell phone site records. At the first trial, the Circuit Court, the Honorable Richard W. Pollack presiding, heard testimony from Monaco, a network engineering manager and custodian of records for Mobi, and allowed cross-examination by Pasene in order to determine whether the State had laid an adequate foundation for the cell phone site records.

Monaco testified that he had over 16 years of experience working with cellular telephones as a radio engineer, systems engineer, and network engineer. He also received on-the-job training on plotting the geographical location of where cell phone calls originated. He explained, "I design, build, and troubleshoot the network from -- everything from the cell sites back to the switch." In explaining how cell phone calls are made, Monaco stated,

> the phone communicates to the cell tower and says, hey, I'm either making a call or I'm -- a call is coming in. And that page happens, and then a communication channel is set up. That channel's used to bridge the radio portion of the network that's from the handset to the cell tower. From that, it's all circuit-switched. It's all, you know, T-1 lines that -- or bring it back to our switch. Our switch connects -- or recognizes who the far end is and switches it over and completes the call to the far end user.

Monaco explained that the "switch," which is like a computer, is manufactured by Nortel and "connects the inbound leg of the call to the outbound leg of the call," and the switch generates the call record. Monaco received training from Nortel in 2005 on translations and routing. He also worked with Nortel during his previous employment with Sprint. Monaco explained that Nortel guaranteed that the switch would work without fail 99.999 percent of the time, and Nortel was selected based on its past performance and reliability. Mobi did not conduct tests on the switch for accuracy. Rather, Monaco explained that "the whole system is fully redundant and alarmed" so if anything fails at any stage in the process of a call, an alarm will sound. Monaco testified that all the information contained in the cell phone site records was generated and kept in the ordinary course of Mobi's business.

24

Monaco further explained that the switch produces call detail records which includes a code identifying the particular cell tower used. In preparing the cell phone site records, he read the code to identify the cell tower used, then he cross-referenced the tower with a database listing the street address for each Mobi tower, which Mobi also kept in the ordinary course of its business. The cell tower address can be looked up manually, but Monaco created a computer program to perform the cross-referencing automatically. In this case, in response to the State's subpoena, Monaco included the street address of the applicable cell phone tower in preparing the cell phone site records.

The Circuit Court found that Monaco qualified as an expert, that the State had laid a sufficient foundation for the admission of the cell phone site records, and that the records were admissible. The Circuit Court explained:

> [the relevant information was] already retained and kept in the phone records of [Mobi]. All they did was actually come up with a program which retrieved the record based on a subpoena from the government, and there's nothing to show that these records aren't trustworthy. . . . This is not a party that created the records. They're a neutral company that retains these records, and they were retrieved based on a subpoena. And they have no interest in the disposition of how the records are generated.
>
> Secondly, with respect to the reliability, this comes in under two ways. He was trained by Nortel. He's worked in the business. He knows some of these companies. He knows the reliability. That's why he was involved in the selection [of the Nortel switch]. He's very familiar with reliability. And secondly, this system has all kinds of redundancy and alerts if there's malfunctioning.

### 2.

During the second trial, Pasene again moved in limine to exclude the cell phone site records. The Circuit Court, the Honorable Rom A. Trader presiding, reviewed Monaco's testimony from the first trial and found that Monaco qualified as an expert in the area of cell phone technology and the application of that technology to the Mobi system. The Circuit Court further ruled that the cell phone site records "would be admissible as business records under 803(b)(6) of the Rules of Evidence." For purposes of the third trial, the Circuit Court incorporated its ruling

25

from the second trial in denying Pasene's renewed motion in limine to exclude the cell phone site records.

3.

At the third trial, Monaco was qualified as an expert in cell phone technology and the technique of locating and plotting origins of cell phone calls using cell phone records. Monaco explained how a cell phone communicates with a cell tower in making a phone call and how that information is collected and maintained by Mobi. Monaco testified that Mobi collects information regarding "the cell tower and sector that the call is made from" so that if problems arise, Mobi knows where to target its repair efforts. Monaco further explained that the general geographical location of where cell phone calls originate can be determined based on the coverage area of the cell tower and sector.

Monaco testified that Mobi maintains records showing what calls were made by a specific phone number and what cell site towers were accessed by that phone in making those specific calls. Such cell detail records are generated, recorded, and maintained by computers (the Nortel switch) at or near the time the calls are made, and the computers are programed to keep accurate records. Monaco explained that such records need to be accurate because "it's important for companies to know when their customers are using the phone. For us it's particularly important to know for troubleshooting purposes when we have issues how to target those areas. So we use those records."

The cell detail records show a Common Language Locating Indicator field (the CLLI field), "a coded number that when decoded gives the cell site and sector." Based on this coded number, Monaco is able to determine the particular cell site or tower, including its street address, that a cell phone was communicating with. Monaco explained how he obtained and prepared the cell phone site records for the 699-1829 cell phone that were introduced at trial.

NOT FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER

B.

1.

We are not persuaded by Pasene's contention that the cell phone site records were inadmissible under HRE Rule 803(b)(6) because they were prepared by Mobi solely in anticipation of litigation or prosecution. The rationale behind the HRE Rule 803(b)(6) "business records" hearsay exception is the "hallmark of reliability" established by the "regularity and continuity [of business records] which produce habits of precision, the actual experience of business in relying upon the records, and the duty to make an accurate record as part of a continuing job or occupation." HRE Rule 803 Commentary and citation (brackets omitted). On the other hand, records prepared in anticipation of litigation may lack reliability and trustworthiness because they are often "created with the motivation of prevailing against a particular party." State v. Fitzwater, 122 Hawai'i 354, 364, 227 P.3d 520, 530 (2010).

In Fitzwater, the Hawai'i Supreme Court concluded that a speed check card that verified the accuracy of police car speedometer could qualify for admission as a business record under HRE Rule 803(b)(6) in an excessive speeding prosecution. The court rejected Fitzwater's claim that the speed check card was inadmissible because it was created in anticipation of litigation. The court reasoned that the speed check card was "created in a non-adversarial setting" and was not "created for use in a particular dispute" or "for the specific purpose of prosecuting Fitzwater." Id.

Similarly, the information and underlying data contained in the cell phone site records were generated and maintained by Mobi as part of its business records independent of and unrelated to the State's prosecution of Pasene. As the Circuit Court observed in admitting the cell phone site records in the first trial, Mobi, the company that created the records, was not a party to the litigation; Mobi was a neutral company that had kept and maintained the relevant information as part of its own business records; and there was nothing to show that the proffered records were untrustworthy. The cell phone site

27

records bore the hallmarks of reliability that underlie the business records exception, and none of the suspect motivations and questions regarding trustworthiness associated with documents created in anticipation of litigation were applicable. See id. at 363-64; 227 P.3d at 529-30. The need by Monaco to query data kept in the company's computer systems or read codes to identify cell towers in compiling the cell phone site records did not prevent them from being admissible under HRE Rule 803(b)(6). See People v. Zavala, 156 Cal. Rptr. 3d 841, 846-47 (Cal. Ct. App. 2013) ("That the documents ultimately entered in trial were necessarily produced by human query does not render the data inadmissible because the underlying data itself was not produced by human input, but rather, was recorded by the computer system itself each time a user made a call."); Commonwealth of Penn. v. McEnany, 732 A.2d 1263, 1272-73 (Pa. Super. Ct. 1999) (concluding that electronically stored call records may qualify as a business record even if it needed to be translated from binary code to understandable English prior to trial).

2.

Pasene's contention that the State failed to show that the information set forth in the records was based on a reliable foundation is likewise without merit. The State's establishment that Mobi relied upon the records in conducting its business and that the records qualified under the business records exception provided strong indicia of reliability. In addition, the State presented evidence that the Nortel switch which generated the underlying data was guaranteed to be 99.999 percent accurate; that Monaco was trained by Nortel; that Monaco was familiar with the reliability of the Nortel switch; and that the Nortel system was fully redundant to prevent malfunctions with comprehensive alarms to warn of problems at any stage of the process. Courts from other jurisdictions that have been called upon to decide whether to admit cell phone site records have almost universally determined that such records are admissible. E.g., U.S. v. Jones, 918 F. Supp. 2d 1, 5 (D.C. 2003); People v. Fountain, 62 N.E.3d 1107, 1124 (Ill. App. Ct. 2016); Johnson, 797 S.E.2d at 563.

Pasene claims that Monaco did not establish that the program he designed to cross-reference a site tower with its street address was widely accepted in the industry. However, Monaco explained that he could have manually looked up the street address for each cell tower but simply designed a program to perform this function automatically. Pasene did not demonstrate that a computer program performing such a basic function had to be widely accepted in the industry before it could be used by an expert. In any event, Monaco testified at trial, explained what the program did, and could have been cross-examined regarding any claimed inaccuracy in cross-referencing a cell tower with its street address.

Pasene also contends that the cell phone site records should have been excluded because they do not precisely establish the location of a cell phone at a given time. This is because testimony at trial showed that a cell phone communicates with the cell tower emitting the strongest signal, which generally, but not always, is the site closest to the cell phone. However, the evidence presented at trial established the limitations on using the cell phone site records to precisely establish the location of a cell phone, and Pasene's argument goes to the weight, and not the admissibility, of the records.

IV.

Pasene argues that the Circuit Court erred in admitting evidence of his meetings and transactions with the undercover officer. Although the Circuit Court precluded the State from referring to these activities as involving drugs,[16] Pasene characterizes the evidence admitted as "evidence regarding the Defendant's prior drug transactions." He contends that the Circuit Court erred in admitting the evidence of undercover contacts because its probative value was substantially outweighed

---

[16] Permitting direct evidence of Pasene's involvement in drugs would have served to strengthen the State's case against Pasene. Such evidence could have been used to show the reason for possible hostility between groups from San Francisco and KPT and why Pasene, who was from San Francisco, would have a specific motive to kill Peneueta, who was from KPT. Such evidence could also have been used to explain why Sakaria and Tagataese, both from KPT, would be familiar with Pasene and feel confident they could identify him, even if they had not personally associated with him.

by the danger of unfair prejudice under HRE Rule 403. We disagree.

The evidence of Pasene's numerous meetings and interactions with the undercover officer in the period immediately preceding the shooting was highly relevant to showing that Pasene was using and in possession of the blue Buick and the cell phone with the number 699-1829 at the time of the shooting. Pasene's use and possession of the Buick and cell phone, in turn, was highly relevant to showing that he was the driver of the Buick who shot and killed Peneueta. Evidence that Pasene was the subject of an undercover investigation and had engaged in numerous interactions with the undercover officer was necessary to explain why the police had focused their attention on Pasene. It also served to enhance the significance and credibility of the testimony of task force officers that Pasene was the only person seen driving the Buick in the month before the shooting and that Pasene was the sole user of the cell phone with the 699-1828 number in their dealing with him.

Pasene was not the registered owner of the Buick or the named subscriber for the cell phone. Pasene claimed at trial that he only occasionally drove the Buick; that the Buick was owned by Muna; and that he was not the person who drove the Buick and shot Peneueta. Pasene also claimed that he only used the cell phone on occasion; that the cell phone belonged to Fasi; and that he did not have possession of the cell phone when the Buick was set on fire in Wahiawa shortly after the shooting. The undercover contacts evidence challenged by Pasene provided direct and concrete links between Pasene and the Buick and cell phone, and thereby served to corroborate the eyewitness testimony that Passene was the driver of the Buick who shot Peneueta. The challenged evidence was therefore highly probative of crucial issues in dispute.[17]

The Circuit Court attempted to minimize any unfair prejudice by prohibiting the State from referring to the undercover contacts as involving drugs. Pasene, however,

---

[17] Pasene fails to show that his proffered stipulation provided the necessary context and the same probative value as the admitted evidence.

contends that the permitted evidence implied that drugs were involved. We conclude that even if the permitted evidence strongly indicated Pasene's involvement in drug activity, the Circuit Court did not abuse its discretion in determining that the  probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. See State v. Cordeiro, 90 Hawai'i 390, 413-16, 56 P.3d 692, 716-18 (2002).

V.

Pasene's argument that the Circuit Court erred in denying Pasene's request to excuse a juror is without merit.

During a break in the testimony of the undercover officer, a juror approached the officer and asked if he practiced martial arts. The officer, recognizing that the person posing the question was a juror, shook his head and had no further contact with the juror, who the officer said was a "[c]omplete stranger." The officer reported the incident to the Circuit Court. In response, the Circuit Court questioned the juror, who verified the officer's account of the incident. The juror stated that he asked the witness if the witness practiced jiu jitsu, to which the witness responded no. The juror stated that this was the extent of the contact. The juror said he had mentioned the incident to one other juror, and he just told the other juror that the witness did not do jiu jitsu. The juror stated that the incident would not affect his ability to be fair and impartial.

The Circuit Court denied Pasene's request to excuse the juror. The Circuit Court found that the juror's inquiry was "fairly innocuous," and that while the juror's inquiry "may be a violation of what the Court's instructions were, there's nothing about that particular encounter that remotely touched upon the facts of this case." The Circuit Court further found that based on its examination of the officer and the juror, there was no suggestion that the juror could not be fair and impartial.

We review a trial court's decision regarding whether to excuse a juror for abuse of discretion. See State v. Jones, 45 Haw. 247, 262, 365 P.2d 460, 468 (1961). We conclude under the

31

circumstances presented that the Circuit Court did not abuse its discretion in denying Pasene's request to excuse the juror.[18]

VI.

Pasene contends that the prosecutor engaged in misconduct which deprived him of a fair trial and that the Circuit Court erred in denying his motions for mistrial and for a new trial that were based on this claim. We conclude that the prosecutor's alleged misconduct did not deprive Pasene of a fair trial and does not warrant vacating his convictions.

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." State v. Mara, 98 Hawai'i 1, 16, 41 P.3d 157, 172 (2002) (citations and internal quotation marks omitted). To determine whether the alleged prosecutorial misconduct requires vacating the defendant's conviction, the reviewing court considers "the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." State v. Clark, 83

---

[18] It appears that the Circuit Court and Pasene viewed the juror's question to the witness as a violation of a prior instruction of the Circuit Court not to have any contact with any of the parties or witnesses in the case. However, the Circuit Court instructed the jurors at the beginning of the trial not to "discuss the case with anyone" and not to "allow anyone to discuss the case with you." With respect to contact with parties and witnesses, it stated:

> We talked about seeing the attorneys, right, out and about the courthouse or anyplace else. If you see them, you can say "hi"; see witnesses, you know, same goes for that. But please have as minimal interaction as you possibly can with them because we want to make sure the trial is fair in actuality -- both in actuality but as well as in perception, okay, all right, and appearances.

Thus, there is some question as to whether the juror's question to the witnesses violated the Circuit Court's prior instruction as the question did not involve a discussion concerning a matter related to the case, and the court's instruction did not prohibit jurors from having all contact with witnesses. In any event, as the Circuit Court found, the brief exchange between the juror and the witness was benign and did not warrant removing the juror. We reject Pasene's contention that the Circuit Court should have questioned the other juror. When asked at trial whether questioning of the other juror would be appropriate, Pasene's counsel deferred to the Circuit Court on that issue, and the record does not indicate that questioning of the other juror was necessary.

Hawai'i 289, 304, 926 P.2d 194, 209 (1996) (citations and internal quotation marks omitted).

After the jury returned its guilty verdicts, the Circuit Court considered Pasene's motions for mistral and new trial, which were based on alleged prosecutorial misconduct during the trial. The Circuit Court considered the same three factors an appellate court considers in reviewing claims of prosecutorial misconduct. While the Circuit Court stated that it did not condone certain aspects of the prosecutor's alleged misconduct, it ruled that the alleged misconduct did not deprive Pasene of a fair trial and denied Pasene's motions. In support of its decision, the Circuit Court concluded that to the extent the prosecutor had engaged in misconduct, it acted promptly in striking the prosecutor's remarks and giving curative instructions, and it cited the relative strength of the State's evidence during the third trial.

A.

Pasene argues that the prosecutor engaged in misconduct by presenting argument in his opening statement and asking leading questions during the State's case-in-chief. Prior to opening statement, the Circuit Court twice instructed the jury to the effect that "what the attorneys say in opening statement is not evidence. The evidence comes from the witness stand and the exhibits that will be admitted in the case." The Circuit Court sustained objections by defense counsel that the prosecutor's remarks in opening statement were argumentative and instructed the jury to disregard one remark. During the redirect examination of Sakaria cited by Pasene in his brief, the Circuit Court sustained several objections that the prosecutor was asking leading questions, and the prosecutor rephrased those questions. We conclude that the prosecutor's alleged misconduct during opening statement and the State's case-in-chief was relatively innocuous and did not prejudice Pasene's right to a fair trial.

B.

Pasene contends that the prosecutor engaged in misconduct during closing arguments by making arguments not

supported by the evidence and in remarks concerning the presumption of innocence.

1.

Pasene cites the following remarks by the prosecutor in closing as improper arguments not supported by the evidence.

a.   The prosecutor characterized Hall, the registered owner of the Buick, as "a mentally handicapped person."  The Circuit Court sustained Pasene's objection to this characterization and instructed the jury to disregard it.  The evidence presented at trial was that Hall did not have a driver's license, was accompanied by a social worker to her police interview, and was described as a "simple person" and a "simple type personality person."

Although the Circuit Court sustained the objection, we conclude that the evidence that Hall was accompanied by a social worker and was described as "simple" and having a "simple type personality" could arguably imply that Hall was mentally handicapped.  In any event, the primary significance of the State's evidence regarding Hall was to show that Hall was not driving the Buick, even though she was listed as the registered owner.  The State introduced evidence that Hall did not have a driver's license and Hall's lack of ownership of or control over the Buick was not disputed.  We conclude that the prosecutor's characterization of Hall did not deprive Pasene of a fair trial.

b.   The prosecutor stated:

> Now, lets talk about Cedro Muna.  Okay.  Cedro Muna was not one of the shooters, but he was one of the suspects.  The detectives told you that.  How was he eliminated as a possible shooter?  They didn't go on his word.  What they did was they told you they went to the Chinatown station and they looked at the camera, and they saw a person that looked like Cedro Muna.

Pasene objected to the prosecutor last statement, and the Circuit Court sustained the objection.  The Circuit Court also struck the prosecutor's remark and gave a strong cautionary instruction:

> You are specifically instructed to completely disregard in its entirety the last statement made by the prosecutor with respect to what may or may not have been observed by law enforcement utilizing the Chinatown surveillance system as to Mr. Muna or anything else for that matter.  And so you are not to consider it in any way, shape, or form in your deliberations.

At trial, Detective McCormick testified that he had eliminated Muna in part by reviewing videotape from Chinatown, but had not stated what he saw on the videotape. The prosecutor's statement was therefore improper.[19] Nevertheless, the prosecutor did not say how seeing Muna on the Chinatown video eliminated Muna as a suspect, and the State introduced ample other evidence supporting the detectives' elimination of Muna as a suspect, including the Plaza Hotel video, the detectives' interviews of taxi driver Kawelolani, and Sakaria and Tagataese, who witnessed the shooting. Given these circumstances and the Circuit Court's strong curative instruction, we conclude that the prosecutor's improper comment did not affect Pasene's substantial rights.

c. Toward the end of the prosecutor's closing, the following exchange occurred:

> [Prosecutor:] Who else IDs Mr. Pasene? [Kawelolani] the taxi driver. [Kawelolani] the taxi driver and [Muna], they're sitting at the light waiting for the light to turn green so they can turn left onto Beretania, and guess what, here comes the blue Buick.
>
> [Defense counsel]: Objection, you Honor. Mr. Kawelolani never identified Mr. Pasene.
>
> [Prosecutor]: He did.
>
> [Defense counsel]: That misstates the testimony.
>
> The Court: At the bench.

At side bar, the Circuit Court noted that Muna had identified Pasene in the blue Buick, but directed the prosecutor to clarify his statement as to Kawelolani because Kawelolani did not directly identify Pasene. When closing argument resumed, the prosecutor clarified that

> [Kawelolani] said that he saw the driver, and he later, like Mary Savusa and Tutuila, recognized that person on the news. Cedro Muna, who is sitting directly behind [Kawelolani] at that same moment, sees the same blue car coming towards the taxi and turning right onto River. He recognizes the car

---

[19] The State notes that at the second trial, Detective McCormick was permitted to testify that in reviewing Chinatown videos, he "saw an individual who resembled Cedro Muna get in the back seat of that taxicab directly behind the driver." While this may provide support for the State's contention that the prosecutor was confused by evidence presented at a prior trial in making the improper argument, it does not justify the prosecutor's action. Obviously, a prosecutor cannot base his or her closing arguments on evidence presented at a prior trial.

because he used to be the owner of that car, and he
recognizes the driver as Iosefa Pasene.

Given the prosecutor's clarification, which accurately
recounted the evidence presented during the trial, we conclude
that any misstatement regarding Kawelolani's identification of
Pasene did not affect Pasene's substantial rights.

2.

The following exchange occurred at the beginning of the
prosecutor's rebuttal closing:

> [Prosecutor]: Let me start where [defense counsel]
> began. He has this nice drawing of presumption of
> innocence, blah, blah, blah, right, it's our burden, and
> we're over here and he draws a stick man. But when you get
> picked up for shoplifting or when you get picked up for a
> DUI, you're presumed innocent. When --
>
> [Defense counsel]: Well, objection, your Honor.
>
> THE COURT: Hold on a second. Overruled.
>
> [Prosecutor]: That's the nature of the system. So
> what he's telling you is a fundamental principle of the laws
> and the justice system.
>
> So John Gotti, when he goes to trial, he's presumed
> innocent.
>
> [Defense counsel]: Objection, your Honor
>
> [Prosecutor]: Charles --
>
> THE COURT: Hold on. Hold on a second. At the bench,
> please.

The Circuit Court sustained Pasene's objection to the
prosecutor's references to "John Gotti" and "Charles" (presumably
Charles Manson) and instructed the jurors to "disregard the last
statements of the prosecutor." The prosecutor resumed by
explaining to the jury: "My point being that our system of
justice, that's the starting point every time no matter what
crime, all right, so it's not something brand-new. It's not some
magical concept. That's how we start. Let's move on."

It appears that the prosecutor was attempting to argue
that the presumption of innocence applies to every defendant in
every case and therefore its existence does not necessarily mean
that Pasene is not guilty. Such an argument would not be
improper. However, the prosecutor's choice of words in making
his argument, such as using the phrase "blah, blah, blah" in

referring to defense counsel's remarks concerning the presumption of innocence, was careless and poor. His references to John Gotti and Charles Manson also raised potential concerns. These concerns, however, were mitigated by the Circuit Court's instruction to disregard the references to John Gotti and Charles Manson and by the prosecutor's subsequent remarks, which indicated that: (1) he was not comparing Pasene to John Gotti or Charles Manson; (2) that his references to them was to show that the presumption of innocence applies to every defendant; and (3) that he was not arguing that the presumption of innocence did not apply to Pasene. Given the circumstances, we conclude that the prosecutor's remarks in rebuttal closing did not deprive Pasene of his right to a fair trial.

C.

In light of the foregoing analysis, and based on our review of the record, we conclude that individually and cumulatively the prosecutor's alleged acts of misconduct did not deny Pasene of a fair trial and do not warrant vacating his convictions.[20]

CONCLUSION

For the reasons set forth in this Memorandum Opinion, we affirm the Circuit Court's Amended Judgment.

DATED: Honolulu, Hawai'i, June 27, 2018.

On the briefs:

Thomas M. Otake,
for Defendant-Appellant.

Presiding Judge

Brian R. Vincent,
Deputy Prosecuting Attorney,
City and County of Honolulu,
for Plaintiff-Appellee.

Associate Judge

Associate Judge

---

[20] We do not condone or excuse a prosecutor's conduct in making improper remarks in opening statement or closing statement or asking improper questions during trial. We agree with the Circuit Court that the prosecutor's conduct in this case created issues that could easily have been avoided and unnecessarily raised the potential for a mistrial.